# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 47506-5-II |
| Respondent, | |
| v. | |
| DAVID MICHAEL KALAC, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — David Michael Kalac broke out of his jail cell, walked up the stairs, and entered the cell of another inmate, Wayne Carlson. Kalac pulled Carlson off of his bunk, kicked him, and put him in a headlock until jail guards arrived approximately two minutes later. Kalac was convicted of first degree burglary, unlawful imprisonment, and attempted fourth degree assault as a lesser included offense to the charged crime of attempted first degree murder.

On appeal, Kalac argues that (1) insufficient evidence was presented to convict him of burglary because the State did not prove (a) Carlson's cell constituted a "building," nor that (b) Kalac's entry or remainder in Carlson's cell was "unlawful"; (2) insufficient evidence was presented to convict him of unlawful imprisonment; (3) the trial court's dismissal without prejudice of his attempted murder charge violates double jeopardy; (4) he received ineffective assistance of counsel when his attorney failed to object to, and signed, the order dismissing the

attempted murder charged without prejudice; and (5) appellate costs should not be awarded against him.

We hold that sufficient evidence exists to persuade a rational trier of fact beyond a reasonable doubt that Kalac was guilty of first degree burglary and unlawful imprisonment. We also hold that the trial court's dismissal without prejudice of his attempted murder charge violates double jeopardy, and accordingly, we do not address his ineffective assistance of counsel claim. Finally, we do not award appellate costs against Kalac. We affirm, but remand for the trial court to dismiss the attempted first degree murder charge with prejudice.

FACTS

In December 2014, Kalac and Carlson were incarcerated in Unit B of the Kitsap County Jail. Unit B has two floors with jail cells on each floor and a dayroom on the lower floor. Each cell is equipped with a speaker and button to activate the speaker, which allows for two-way communication between the cell and the guards. The door to each cell locks automatically when it is closed. The door to each cell has a window, allowing people to speak through the doors. The dayroom is a common area that is used by the inmates of Unit B at different times depending on which floor of Unit B they are housed; the inmates housed on the lower floor are not in the dayroom at the same time as inmates from the upper floor. One wall of the dayroom is a one-way mirror, allowing guards to observe the activity in the dayroom without being in the dayroom. The one-way mirror also enabled the inmates housed on the lower floor to see the majority of the cells on the second floor. Inmates housed in the lower floor are not allowed on the upper floor, and no inmate is allowed in another inmate's cell.

Kalac was housed in the lower floor of Unit B and Carlson was housed in the upper floor. Sometime in early December 2014, while Carlson was in the dayroom and Kalac was locked in his cell, Carlson flipped Kalac off. The two subsequently engaged in a heated verbal exchange at Kalac's cell door, with Carlson in the dayroom and Kalac locked in his cell. Kalac decided to fight Carlson.

On December 9, 2014, Kalac returned to his cell from the dayroom and placed a playing card in the locking mechanism of his cell door. He then closed his cell door, making it appear to the guards as though he were locked in, while the playing card kept the door from locking. Kalac watched the reflection in the one-way mirror as Carlson returned to his cell but did not close his cell door. Kalac then pushed his cell door open and proceeded upstairs to Carlson's cell. The video recordings of the dayroom show it was 4:58 p.m.

Kalac entered Carlson's cell, closed the door behind him, and pulled Carlson off of the top bunk. Kalac's and Carlson's accounts of the following assault differ, but both agree that Kalac kicked and tried to punch Carlson before putting Carlson in a headlock. During the scuffle, Carlson was able to push the emergency button in his cell repeatedly and Carlson's head hit the sink in the cell. Three officers responded, ordering Kalac to stop and get on the ground with his hands behind his back. Kalac complied and the officers entered. The video recordings of the dayroom show the officers entering Carlson's cell at 5:00 p.m.

Kalac was charged with first degree burglary, unlawful imprisonment, and first degree attempted murder. A jury found him guilty of first degree burglary, unlawful imprisonment, and attempted fourth degree assault as a lesser included offense to the attempted first degree murder

charge.[1] The jury also found by special verdict that Kalac restrained Carlson without consent and by physical force, intimidation, or deception. The trial court entered an order dismissing the attempted first degree murder charge without prejudice. Kalac was sentenced to a total of 41 months and, finding that Kalac did not have the ability to pay legal financial obligations (LFOs), the sentencing court imposed only mandatory LFOs. Kalac appeals.

ANALYSIS

A.     SUFFICIENCY OF THE EVIDENCE

A challenge to the sufficiency of the evidence to convict is a constitutional question we review de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Our Supreme Court in *Rich* explained this court's review on a sufficiency of the evidence challenge as follows:

> The State bears the burden of proving all the elements of an offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. To determine if sufficient evidence supports a conviction, we consider "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime *beyond* a reasonable doubt.'" *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (some emphasis omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). "[I]nferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). A "'modicum'" of evidence does not meet this standard. *Jackson*, 443 U.S. at 320.

*Rich*, 184 Wn.2d at 903.

---

[1] Because the jury found Kalac guilty of fourth degree assault as the lesser included offense to the attempted first degree murder charge, no mistrial was declared on the attempted first degree murder charge.

4

1. Burglary Conviction

Kalac argues insufficient evidence was presented at trial to convict him of burglary. Specifically, Kalac argues insufficient evidence was presented to establish that Carlson's cell was a "building," and that his entry into or remaining within Carlson's cell was "unlawful," as each term is used in the burglary statute. Br. of Appellant at 9-17. We hold that sufficient evidence was presented to show Carlson's cell was a "building" and Kalac's entry and remainder in Carlson's cell was "unlawful" as those terms are defined in Washington's statutory proscription of burglary.

Kalac was convicted of first degree burglary. First degree burglary is statutorily proscribed in Washington as follows:

> A person is guilty of burglary in the first degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1). Thus, first degree burglary requires, as elements to the offense, that the defendant enter or remain "unlawfully" in a "building." RCW 9A.52.020(1).[2]

We review issues of statutory construction de novo. *State v. Wentz*, 149 Wn.2d 342, 346, 68 P.3d 282 (2003). We look to the statute's plain language in order to give effect to legislative intent, giving statutory terms their plain and ordinary meaning. *Id*. at 346. Whenever possible, statutes are read in harmony and in such manner as to give each effect. *State v. Bays*, 90 Wn. App.

---

[2] The to-convict jury instruction mirrored this language. Kalac does not assign error to any of the jury instructions.

731, 735, 954 P.2d 301 (1998). Statutes are interpreted to give effect to all language in them and to render no portion meaningless or superfluous. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003).

    a.    "Building"

Kalac argues that jail cells are not "buildings" within the meaning of the statute, but at the very least, the rule of lenity requires the adoption of a narrower definition of "building." Br. of Appellant at 15. In support, he uses the definitions of "building" from *State v. Thomson*, 71 Wn. App. 634, 861 P.2d 492 (1993); *State v. Deitchler*, 75 Wn. App. 134, 876 P.2d 970 (1994), *review denied*, 125 Wn.2d 1015 (1995); and *State v. Miller*, 91 Wn. App. 869, 960 P.2d 464 (1998), *review denied*, 137 Wn.2d 1012 (1999), to argue that in order for a place to be considered a building, there must be "a separate 'privacy interest' from other tenants in their space." Br. of Appellant at 12 (quoting *Thomson*, 71 Wn. App. at 645). We hold that jail cells are "buildings" for purposes of the burglary statute.

RCW 9A.04.110(5) provides the statutory definition for "building" as follows:

> (5) "Building," in addition to its ordinary meaning, includes any dwelling, fenced area, vehicle, railway car, cargo container, or any other structure used for lodging of persons or for carrying on business therein, or for the use, sale, or deposit of goods; each unit of a building consisting of two or more units separately secured or occupied is a separate building.

"Dwelling" is "any building or structure . . . or a portion thereof, which is used or ordinarily used by a person for lodging." RCW 9A.04.110(7).

In *Thomson*, a woman invited Thomson back to her house one night, whereupon she rebuffed his sexual advances and told him he could sleep in the guest bedroom. 71 Wn. App. at

6

636. The woman returned to her room and locked her bedroom door behind her. *Id.* During the night, Thomson broke through the woman's bedroom door and raped her. *Id.* On appeal, the court held that the woman's entire home constituted a "building" under RCW 9A.04.110(5), rather than her individual room. *Id.* at 646.

The *Thomson* court held that the phrase of RCW 9A.04.110(5) that follows the semicolon—"each unit of a building consisting of two or more units separately secured or occupied is a separate building"—was intended by the legislature to define each unit within a multi-unit structure as an individual "building" where each unit is occupied by different tenants. *Id.* at 645. The court reasoned that, in a multi-unit structure, "each tenant has a privacy interest in his or her room or apartment, and that interest is separate from the interests of other tenants." *Id.* The court further held that applying "the rule of lenity would lead us to the same construction of the statute," specifically, that "RCW 9A.04.110(5) should be construed as applying to multi-unit buildings in which two or more rooms are occupied or intended to be occupied by different tenants separately, but not to dwellings wholly occupied by a single tenant."[3] *Id.* at 645-46.

A year later, the issue of what constituted a "building" under RCW 9A.04.110(5) was again considered in *Deitchler*, 75 Wn. App. at 136. The *Deitchler* court held that an evidence locker in a police station that was ten inches high, by ten inches wide, and about two feet deep, was not a "building" under RCW 9A.04.110(5), and therefore, a burglary conviction could not be affirmed. *Id.* at 135, 137.

---

[3] The court defined the rule of lenity, "The rule of lenity provides that ambiguity in a criminal statute should be resolved in favor of the defendant." *Thomson*, 71 Wn. App. at 645.

The court explained:

> RCW 9A.04.110(5) has two parts, one preceding and one following the semicolon. The first deals with "buildings" not within a larger "building." The second deals with "buildings" within a larger building. According to the second, a structure or space within a larger building will be a "separate building" if the larger building has "two or more units separately secured or occupied", and the structure or space being considered is one of those "units". By negative implication, a structure or space within a larger building will *not* be a "separate building" *unless* the larger building has "two or more units separately secured or occupied", and the structure or space being considered is one of those "units".

*Id.* at 137. Because the police station was occupied by a single tenant, the *Deitchler* court held there was no separate privacy interest between the police station and the evidence locker such that the evidence locker could be considered a separate building. *Id.*

Finally, the definition of "building" under RCW 9A.04.110(5) was again considered in *Miller.* 91 Wn. App. 869. In *Miller*, an apartment manager discovered Miller in or around the basement storage locker of one of the apartment's tenants and called the police. *Id.* at 870-71. The police tracked Miller's car and called the manager to identify Miller and the items in Miller's possession. *Id.* at 871. The manager was able to unlock a padlock found in Miller's jacket with his manager's keys and identify luggage in Miller's back seat that came from a storage locker of one of the apartment's tenants. *Id.*

The *Milller* court held that the storage locker was considered a separate "building," apart from the larger apartment building within which the storage locker was located. *Id.* at 870. The court reasoned that "the storage locker Miller broke into was large enough to accommodate a human being, that is, to allow entry or occupation." *Id.* at 873. "Moreover, the padlocked, door-

accessed unit was secured from other tenants, the manager or building owners of the apartment complex, indicat[ed] a separate privacy interest." *Id.*

Here, the language of the statute defining "building" unambiguously includes a jail cell, and the reasoning expressed in *Thomson*, *Deitchler*, and *Miller* support the definition of "building" to include a jail cell. First, jail cells are "used for lodging of persons," and therefore fit the plain language of the statutory definitions of "building" and "dwelling" as defined in the burglary statute. RCW 9A.04.110(5) ("'Building,' . . . includes any dwelling . . . or any other structure used for lodging of persons"); RCW 9A.04.110(7) ("'Dwelling' means any building or structure . . . or a portion thereof, which is used or ordinarily used by a person for lodging"). Second, *Thomson*, *Deitchler*, and *Miller* each held that the portion of the definition of "building" that follows the semicolon was intended by the legislature "to define 'building' to include each unit of a multi-unit building where each unit is occupied by a different individual." *Miller*, 91 Wn. App. at 872. A jail is a multi-unit building where each unit is occupied by a different individual or, in this case, a different pair of individuals.

Kalac's argument that there must be "a separate 'privacy interest' from other tenants" in order for it to be a considered a building fails because the reasoning from *Thomson*, *Deitchler*, and *Miller* support the opposite conclusion. Br. of Appellant at 12 (quoting *Thomson*, 71 Wn. App. at 645). Here, the inmates have an interest in their respective jail cells that are "separate from the interests of [the] other tenants," where those "other tenants" are the other inmates. *Thomson*, 71 Wn. App. at 645 (reasoning that units within a multi-unit structure are separate buildings for purposes of the burglary statute when the tenants of each unit have an interest in their unit that "is

separate from the interests of other tenants."). Additionally, within Unit B, there are 13 cells on each floor and each cell has its own locking mechanism; thus, the jail is "the larger building [and] has 'two or more units separately secured or occupied,'" making each "unit," or jail cell, a "separate building." *Deitchler*, 75 Wn. App. at 137 (reasoning that a space is considered a "'separate building' if the larger building has 'two or more units separately secured or occupied.'"). Finally, each cell is "large enough to accommodate a human being" and is designed to be secured from other inmates, and, therefore, each cell is considered a "building" for the purposes of the burglary statute. *Miller*, 91 Wn. App. at 873 (reasoning that a space was considered a building when it "was large enough to accommodate a human being, that is, to allow entry or occupation," and was secured from other tenants but not the manager of the larger structure).

In conclusion, we hold that jail cells are separate buildings within the meaning of RCW 9A.52.020(1) and RCW 9A.04.110(5), and that sufficient evidence was presented to establish that Carlson's cell was a "building." The rule of lenity does not apply to give Kalac's interpretation effect because there is no ambiguity in the statutes as they relate to the inclusion of a jail cell within the definition of a "building" that can be burglarized under RCW 9A.52.020(1) and RCW 9A.04.110(5).

        b.     "Unlawfully"

Kalac argues that even if the cell qualified as a building, the State failed to prove that he "unlawfully" entered or remained in Carlson's cell. Br. of Appellant at 16. Specifically, Kalac argues that the State did not present any evidence of jail regulations that forbade inmates from entering another inmate's cell. We disagree.

Former RCW 9A.52.010(3) (2011) provides the statutory definition for "[e]nters or remains unlawfully."

> A person "enters or remains unlawfully" in or upon premises when he or she is not then licensed, invited, or otherwise privileged to so enter or remain.

"'Premises' includes any building [or] dwelling." Former RCW 9A.52.010(1). "The law of burglary was designed to protect the dweller, and hence, the controlling question here is occupancy rather than ownership." *State v. Schneider*, 36 Wn. App. 237, 241, 673 P.2d 200 (1983).

Here, Carlson testified that there is a rule book and inmates are provided those rules when they are booked into the jail. He testified the rules do not allow inmates from the lower floor to go to the second upper floor and that inmates are not allowed to go into other inmates' cells. Kalac testified that he knew he was not supposed to go into another inmate's cell, that he should not have been in Carlson's cell, and that he intentionally went into Carlson's cell without invitation. He further testified that he knew he would be seen and caught in Carlson's cell. Finally, the cell Carlson occupied was a "premises" for the purposes of the burglary statute because it was a "building." *See* subsection a, *supra*. Accordingly, the testimony presented at trial established Kalac was not "licensed, invited, or otherwise privileged to so enter or remain" in the cell Carlson occupied, and therefore, we hold Kalac's entry and remainder in the cell Carlson occupied was "unlawful." Former RCW 9A.52.010(3).

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt the elements of burglary Kalac challenges. Therefore, we affirm his conviction for first degree burglary.

2.      Unlawful Imprisonment Conviction

Kalac argues that the evidence presented was insufficient to convict him of unlawful imprisonment.   Specifically, Kalac argues that he did not restrain Carlson's movements in a "substantial" or "considerable" manner.  Br. of Appellant at 19, 20, 21.  We hold that sufficient evidence was presented to convict Kalac of unlawful imprisonment.

"A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.040(1). "'Restrain' means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty. Restraint is 'without consent' if it is accomplished by (a) physical force, intimidation, or deception." RCW 9A.40.010(6).  For restraint to be substantial, there must be a "'real' or 'material' interference with the liberty of another as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict." *State v. Robinson*, 20 Wn. App. 882, 884, 582 P.2d 580 (1978), *aff'd*, 92 Wn.2d 357, 597 P.2d 892 (1979).

Here, Kalac entered Carlson's cell and closed the door, knowing that when the door closed it would lock and remain so until unlocked by the guards who would come break up the fight. Kalac testified that when he heard the guards enter the dayroom downstairs and yell "lockdown" he put Carlson in a headlock and "wanted to hold on to Mr. Carlson long enough for the guards to get there" to the door of Carlson's cell.  6 VRP at 909.  Kalac held Carlson in a headlock inside the locked cell until ordered to release him by the guards.  The guards then unlocked the cell and opened the door.  Under these facts, viewed in the light most favorable to the prosecution, a rational trier of fact could find that Kalac knowingly restricted Carlson's movements without Carlson's

consent or legal authority by physical force. Therefore, we hold that sufficient evidence was presented to convict Kalac of unlawful imprisonment.

Kalac argues that our Supreme Court changed the standard for "substantial" from the "'real' or 'material' interference with the liberty of another as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict," as stated in *Robinson*, 20 Wn. App. at 884, to "considerable," and cites to *State v. McKague*, 172 Wn.2d 802, 805, 262 P.3d 1225 (2011), and *Rich*, 184 Wn.2d at 904-05. We disagree.

In *McKague*, our Supreme Court considered a challenge to the sufficiency of the evidence to convict on a second degree assault charge. 172 Wn.2d at 805. Specifically, the court considered the definition of "substantial" for the element of "substantial bodily harm" under second degree assault, RCW 9A.36.021(1)(a).[4] *McKague*, 172 Wn.2d at 805. Our Supreme Court held that the dictionary definition of "substantial" as "'something having good substance or actual existence,' would make practically any demonstrable impairment or disfigurement a 'substantial' injury regardless of how minor." *McKague*, 172 Wn.2d at 806 (quoting *State v. McKague*, 159 Wn. App. 489, 503 n.7, 246 P.3d 558 (2011)). The court held "instead that the term 'substantial,' as used in RCW 9A.36.021(1)(a) [second degree assault], signifies a degree of harm that is considerable and necessarily requires a showing greater than an injury merely having some existence." *McKague*, 172 Wn.2d at 806.

---

[4] "A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree: (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm." RCW 9A.36.021(1).

In *Rich*, our Supreme Court considered a challenge to the sufficiency of the evidence to convict on a reckless endangerment charge. 184 Wn.2d at 900-01. To convict on the reckless endangerment charge, the State had to prove there was a "'substantial risk of death or serious physical injury.'" *Rich*, 184 Wn.2d at 904 (quoting RCW 9A.36.050(1)). Our Supreme Court recognized there was no statutory definition for "substantial" as it is used in RCW 9A.36.050(1), and looked to the definition it used in *McKague*, "as 'considerable in amount, value, or worth' and more than just 'having some existence.'" *Rich*, 184 Wn.2d at 905 (quoting *McKague*, 172 Wn.2d at 806).

Here, we decline to hold that the *Robinson* definition of "substantial" has been replaced with the *McKague* and *Rich* definition for "substantial." *Robinson* specifically addressed the term "substantial" as it is used in the unlawful imprisonment statute. 20 Wn. App. at 883-85. Unlawful imprisonment is proscribed in chapter 9A.40 RCW. *McKague* and *Rich* addressed the term "substantial" as it is used in the second degree assault and reckless endangerment statutes, both of which are proscribed in chapter 9A.36 RCW. The definition from *Robinson* remains good law, at least in the context of sufficiency challenges to unlawful imprisonment convictions. *See e.g. State v. Washington*, 135 Wn. App. 42, 49-50, 143 P.3d 606 (2006) (stating, in the context of a sufficiency of the evidence challenge to an unlawful imprisonment conviction, "A substantial interference is 'a real or material interference with the liberty of another as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict," (quoting *Robinson*, 20 Wn. App. at 884), *review denied*, 160 Wn.2d 1017 (2007)).

14

But, even applying the definition of "substantial" that our Supreme Court has used for second degree assault and reckless endangerment, we still hold that sufficient evidence was presented at trial to convince a rational trier of fact of Kalac's guilt beyond a reasonable doubt. As recited above, Kalac entered Carlson's cell and closed the door knowing it could not be opened from the inside, and he subsequently placed Carlson in a headlock so that he could not move until the guards arrived. Testimony at trial showed the headlock resulted in Carlson feeling like his circulation and ability to breathe were cut off, and resulted in red marks on the side of Carlson's throat. Viewed in the light most favorable to the State, this evidence was sufficient to persuade a rational trier of fact that Kalac's restraint of Carlson was "'considerable in amount, value, or worth' and more than just 'having some existence,'" as our Supreme Court has defined the term "substantial" in other chapters of the RCW. *Rich*, 184 Wn.2d at 905 (quoting *McKague*, 172 Wn.2d at 806). Therefore, we hold that Kalac's challenge to the sufficiency of the evidence to convict him of unlawful imprisonment fails.

B.    DOUBLE JEOPARDY

Kalac argues that the trial court erred in signing an order of dismissal without prejudice on the charge of attempted first degree murder. We agree and remand to the trial court to dismiss the attempted first degree murder charge with prejudice.

The federal and Washington constitutions prohibit placing defendants in double jeopardy. WASH. CONST. art. I, § 9; U.S. CONST. amend. V. The prohibitions on double jeopardy provide that "a conviction on a lesser-included offense bars a subsequent trial on the greater offense." *Illinois v. Vitale*, 447 U.S. 410, 421, 100 S. Ct. 2260, 65 L. Ed. 2d 228 (1980).

15

Here, the State "concedes that on this record it may not retry Kalac on that charge" of attempted first degree murder of Carlson. Br. of Resp't at 23. Because the jury found Kalac guilty of fourth degree assault as the lesser included offense for the attempted first degree murder charge, we accept the State's concession and remand for dismissal of the attempted first degree murder charge with prejudice.

C.      INEFFECTIVE ASSISTANCE OF COUNSEL

Kalac argues that he received ineffective assistance of counsel when his attorney failed to object to, and instead signed, the order dismissing the attempted murder charge without prejudice. We do not reach this issue because the relief Kalac requests in asserting his ineffective assistance of counsel claim—that the charge be dismissed with prejudice—has been granted on double jeopardy grounds. *See* Section B, *supra*.

D.      Appellate Costs

Kalac argues that any requests for appellate costs to be imposed on him be denied because the trial court determined that he did not have the present or future ability to pay legal financial obligations. The State asserts that it "has no intention of seeking appellate costs in this case." Br. of Resp't at 24.

RAP 15.2(f) provides that "[t]he appellate court will give a party the benefits of an order of indigency throughout the review unless the trial court finds the party's financial condition has improved to the extent that the party is no longer indigent." Here, an order of indigency was filed with the trial court and the record does not reflect a finding by the trial court that Kalac's financial

No. 47506-5-II

condition has improved beyond indigency. Therefore, we do not impose any appellate costs on Kalac in this case.

We affirm but remand for the trial court to dismiss the attempted first degree murder charge with prejudice.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, P.J.

We concur:

_____
Melnick, J.

_____
Sutton, J.

17